HUMES, n.c.m., Etc. *v.* KRAUSS, et al.

May 24, 1954

No. 39193 66 Adv. S. 10 72 So. 2d 737

*L. F. Easterling, Ernest Shelton,* Jackson, for appellant.

*Corban & Corban,* Fayette; *Satterfield, Ewing, Williams & Shell,* Jackson, for appellees.

ROBERDS, P. J.

During the year 1937, and for many years prior thereto, James Humes was the owner of a tract of 66 acres of land located in Jefferson County, Mississippi. There is some confusion as to who was the record title holder but we will assume that Humes was the true owner.

The land sold April 5, 1937, September 16, 1940, April 7, 1941, and April 6, 1942, for nonpayment of taxes, at which sales the lands were purchased by J. Krauss and G. J. Halford, the appellees on this appeal.

On April 7, 1950, James Humes, by Bernice Humes, his wife and next friend, filed his original bill in this cause, and on October 23, 1951, by his said wife as guardian, he filed an amended bill. He attacked the validity of the sales on various asserted grounds, but further alleged that even though the sales were valid, he yet had the right to redeem the lands therefrom.

Appellees, by answer, took issue on the allegations of the bill, and, by cross bill, contended that even though the sales were invalid, cross complainants had title to the land by three years adverse possession under Section 716, Miss. Code 1942 (Section 2288, Code 1930).

The chancellor, after extended hearings, held the tax sales were legal and that Humes' right to redeem from the sales had expired, and that appellees were vested with title to the lands both by virtue of said sales and by adverse possession. From that decree this appeal was taken.

After the appeal was taken and during its pendency Humes died and the cause was revived in the name of his heirs-at-law.

Appellants first contend, as their main point, that James Humes was insane, or of unsound mind, at the time of said sales and when time for redeeming the lands from such sales expired, and that, although the two years ordinarily allowed for redeeming lands from

tax sales had expired when he filed his bill, yet, because of that mental disability, he had such right at the time he filed the bill. The chancellor expressly found the facts against that contention. Appellants urge us on this appeal to hold that the chancellor was manifestly wrong in that finding and ask us to adjudicate that Humes was of unsound mind and had the right to redeem the lands from the sales.

Section 9948, Code 1942, in force when these sales took place, provides that land may be redeemed within two years after the date of sale in the method prescribed in the statute, but savings to "persons of unsound mind whose land may be sold for taxes the right to redeem the same within two years after * * * being restored to sanity." It does not appear that this Court has had occasion to define what is meant by "unsound mind" as used in said statute and as applied to right to redeem land from tax sales.

Section 698, said Code, reads: "The term 'unsound mind', when used in any statute in reference to persons, shall include idiots, lunatics, and persons non compos mentis."

The definitions in other jurisdictions are of little help. They are deduced under various statutes and differ greatly in scope, as shown by many definitions set out in Vol. 43, Words and Phrases, p. 394, et seq. For instance, a Missouri court said unsoundness of mind exists where there is essential deprivation of reasoning faculties, and unless minds betray total lack of understanding or idiocy or delusion they cannot properly be considered unsound. In re Bearden, 86 S. W. 2d 585 (Mo. App.). An Indiana court said unsound mind includes every species of insanity or unsoundness of mind. Burkhart v. Gladesh, 123 Ind. 337, 24 N. E. 118. In 44 C. J. S. at page 47 this definition is set out: "Unsoundness of mind or mental unsoundness. The phrase has been judicially declared to be synonymous with 'insanity', see supra subdivision b (3) of this section. It exists

where there is an essential privation of the reasoning faculties, or where a person is incapable of understanding and acting with discretion in the ordinary affairs of life. It has been held included by the terms 'mental disease', 'mental disorder', and 'mental illness', supra. While 'unsoundness of mind' covers the whole range of mental weakness from idiocy up, yet is said to have a determinate and fixed significance importing not mere weakness of understanding, but a total deprivation thereof, although it may embrace monomania. It has been specifically held that eccentricity, uncleanliness, slovenliness, neglect of person and clothing, and offensive and disgusting personal habits, do not constitute unsoundness of mind, and also that incipient arteriosclerosis is not mental unsoundness within the meaning of the law.''

The Supreme Court of this State has uniformly held the test of capacity to execute a will is the ability of the testator at the time to understand and appreciate the nature and effect of his act, the natural objects or persons to receive his bounty, and their relation to him, and is capable of determining what disposition he desires to make of his property.

Fortenberry v. Herrington, 188 Miss. 735, 196 So. 232; Cowart v. Cowart, 211 Miss. 459, 51 So. 2d 775.

The rule as to deeds is whether the grantor had sufficient mental capacity to reasonably understand the nature of the transaction and its consequences and effect. Giles v. Smith, 114 Miss. 665, 75 So. 451. And the test in both cases is whether the testator or grantor had that capacity at the time of execution of the instrument.

■■ Without undertaking to state a theoretical applicable rule, we deem it sufficient to say, from analogy of the foregoing Mississippi cases, that in order for complainant to prevail in this cause on the ground of lack of mental capacity, it was necessary for him to show, by a preponderance of the testimony, that he did not pos-

sess, during the time for redemption, sufficient mental power to understand that if he failed to pay taxes upon the land it would sell for such nonpayment and that he would likely lose title thereto as a result of such sale.

We now give a summary of the testimony on mental capacity. Joe Davis was the first witness for complainant.

He rented the land from Humes from 1926 to, and including the year, 1940. He said Humes' mind was not good, and he mentioned one occasion when Humes, while riding a horse, failed to recognize and stop at his own home. He paid the rent for a time to Humes and then paid it to Humes' wife because he did not consider Humes capable of transacting business. He was a nephew of Humes' wife. The effect of his testimony is weakened, first, by the uncertainty of the time to which he had reference, and, second, by the fact that the record contains four written leases of the land to Davis, all signed by James Humes, and dated March 6, 1937; March ____, 1938; January 10, 1939, and January 18, 1940. The witness was asked: "Q. And you signed with James Humes? A. Yes, sir. Q. He had sense enough to make contracts with you up until 1941 and you never questioned his sense in making the leases? A. I could not. I was just on the place and stayed there."

The next witness for complainant was his son James E. Humes. He lived on the land in question about the year 1920. He said his father and mother moved to Jackson about that time. Witness moved to Chicago and had been living there thirty years when he testified. He usually came to visit his father and mother once a year. He said his father "had spells". He said "* * * he didn't consider him being totally insane then, but every time I would come back he would have those crazy spells." He was asked if he considered his father unable to attend to business in 1937 and replied: "He must have been off to let it mess up like that." He said he heard

the taxes had not been paid "immediately after it was, I guess," but he did nothing about it. He was given the dates of tax sales and asked where he was on those dates. He replied "I know I was not here. I would have taken up them, but I have been gone continuously for thirty years, only I would make one trip every year, and I could not recall being here on those dates, and I could not say I was here or I was not exactly on those dates." "Q. And you don't know the condition of your father on those dates? A. I could not say I was here or was not here, I did not check the dates, I would have to be honest."

The third witness for complainant was Will Doss, his son-in-law. He said that in 1935, to his recollection, "The old man had gone peculiar somewhat." "Q. Was he off all of the time? A. It went and come at that time. Q. It went and come at that time, then would his mind be all right for a while? A. Yes, sir." He said the "old man" got worse as time went by until he seemed "clear out of his mind". However, he said Humes worked as a brick mason and mowed yards in Jackson. This witness lived at Vicksburg and he saw Humes every three or four months. He said in 1935 "the old man had gone peculiar somewhat." In 1939 or 1940 Humes came on the train to visit him at Vicksburg and he went by the place he was supposed to alight from the train. He said he didn't think Humes was able to "transact business" in 1936 or 1937. He explained that Bernice Humes, wife of complainant, and her husband, while they resided in Jefferson County, lived on sixty-two acres of land immediately adjoining on the north the land in question, which sixty-two acres belonged to Bernice.

Elmo Fizer lived near Humes. He saw Humes once or twice a week. He said Humes was sick and didn't have a very good mind. "He was always ailing." He said Humes' mind "went and came". At times he was all right.

Clave Stampley married Humes' daughter. He said at first Humes "just acted off—he just acted kind of funny." Further, "He acted kind of funny, after I moved over there he just got that old way of wanting to go." He said in later years Humes would be "on and off. Come and go." He admitted he had made a statement to an attorney to the effect that Humes "was all right", but said he found out later he was mistaken. He lived within fifty feet of Humes. He had never been in Humes home but once. At one place he said he had not heard before 1941 or 1942 Humes' mind was bad.

Dr. A. M. Hall testified. He was a practicing physician in Jackson. He was called to see Humes in 1941. Humes was violent at the time and he gave instructions that he be carried to a hospital. He never treated Humes. He was not his family doctor. He had treated Humes' daughter, who lived across the street. While doing that he had seen Humes and he had no appearance of being "off". He said people in Humes' condition act perfectly normal at times. He never saw Humes again.

Dr. D. W. Jones lived in Jackson. Sometime after 1938 he visited Humes as a doctor. Humes had high blood pressure and kidney trouble. He attended Humes only a few times. He was asked if Humes was "able and capable and of sound mind enough to tend to business", and he replied "I didn't think so. I think he was rather childish." He finally said he visited Humes only once—"I just place it at one time." That was the evidence offered by complainant on mental capacity.

Mr. G. J. Halford, one of the defendants, testified. He bought the property for himself and Krauss at all four sales. In 1940 Humes came to see him about redeeming the property. He and Mr. Krauss told Humes "We would let him redeem it and pay just what money we were out plus damages." Humes did not take up the offer. Sometime later Humes and his wife came to see him again. At that time conditions had changed

somewhat and he and Krauss offered to sell the land back to Humes for $300.00, retaining oil rights, with a small cash payment. Humes agreed to this but never came back. Halford testified that Humes appeared to be entirely all right from a mental standpoint. Humes told Halford on the first trip that Mr. Gillis, the chancery clerk, had instructed him to go see Mr. Halford about redeeming the land.

Mr. O. S. Gillis testified. He had been chancery clerk thirty-six years and a county official for forty-nine years, including the offices of circuit clerk and sheriff. He executed all of the tax deeds to Halford and Krauss. He said that Humes came to him after time for redemption from the 1937 sale had expired and wanted to redeem the land. He explained that the time for redemption had expired and he told Humes to see Mr. Halford. Humes came back again later and they discussed the question of Humes reacquiring title to the land. He was again told the time had elapsed, and he should see appellees. Mr. Gillis testified that Humes appeared to be perfectly normal mentally on these visits to him; that he had known Humes since 1905 and had frequently seen him and that Humes' mental condition appeared to him to be the same as it had been through the years he had known him. In fact, this witness said he had never heard that there was anything wrong with Humes' mental condition.

Can we say the chancellor was manifestly wrong, or did not have substantial evidence to support his finding? We do not think so.

We can understand how the chancellor might have reasoned upon this question. Complainant introduced six lay witnesses. Four of these were close relatives of complainant and his wife. This fact may, or may not, have influenced their testimony, but it certainly was a strong circumstance for the chancellor to consider. In addition, all of them were somewhat vague as to the mental condition of Humes at any particular time. Dr.

Hall saw him once and that was in 1941. Dr. Jones saw him sometime after 1938. Apparently both doctors saw him after the time for redeeming the land from the 1937 sale had expired.

On the other hand, it is shown that Humes executed written leases on the land to Davis in 1937 and 1938 and 1939 and 1940. The record further discloses that on April 3, 1935, Humes and his wife executed a trust deed on her sixty-two acres to a Mrs. Posey.

Humes went to Mr. Gillis, the chancery clerk, twice for the purpose of redeeming the land or reacquiring title thereto. He knew the land had been sold for taxes and he knew of the right to redeem, although he undertook to exercise it too late. Mr. Gillis sent him to appellees. Mr. Gillis had known him since 1905 and he appeared to Mr. Gillis to be all right from a mental standpoint. He went to Halford and was informed appellees would permit him to redeem by his paying the amount required by the statute. He and his wife came back to appellees later and they offered to sell it to him for $300.00, with small cash payment. No one contradicted in the slightest what these two witnesses said. Humes' wife, who was present at some of these conversations, did not testify. This testimony bore directly upon the question involved — whether Humes had the capacity to realize he had not paid his taxes and that his land would sell for such nonpayment and he might lose title to the land. It shows clearly he had that power. On the other hand, witnesses for complainant said they thought he was not capable of "attending to business", which, of course, would cover a field from the simple process of buying a stick of candy to that of understanding the intricacies of a merger of giant corporations. The burden was upon complainant to show lack of sanity, directed to the standard we have set out, and overcome the presumption of the law that every person is sane. We cannot say the finding of the chancellor was manifestly wrong, or that he did

not have substantial testimony to support his finding.

Appellants say it was error for the chancellor to admit and consider extrinsic evidence in aid of the description on the assessment rolls.

The title deeds contain this description: "That certain 66 acres allotted to P. D. Thompson and Emerline Swanson as shown by that certain deed of record in the office of the Chancery Clerk of Jefferson County, Mississippi, in Book P. P. P. at page 558 thereof, dated May 17, 1905, between C. G. Thompson, Bernice Humes, P. D. Thompson, Emerline Swanson and Under Davis, being the sole and only lawful heirs of Melvin Thompson, deceased, in the matter of a division of the landed estate of the said Melvin Thompson, who had theretofore died intestate, and being more particularly described as 66 acres and bounded on the North by the 62 acres allotted to C. G. Thompson and Bernice Humes in said division, and on the East by the lands of Augusta Thompson in the said division, and on the West by lands of Elbert Thompson in said division, and on the South by the lands commencing at a stake on the west boundary line of the said Melvin Thompson estate (said stake being 6.63 chains north of the Franklin County line), and thence East across the Melvin Thompson lands to the Augusta Thompson lands, and being bounded on the South by the lands allotted to Under Davis in said division; said lands lying and being situated in Section ..........., Township 8, Range 1 East, containing 66 acres, more or less; and being the same lands conveyed to the said P. D. Thompson by Emerline Swanson, et al., by deed dated March 14, 1906."

The land was described on the assessment rolls in this manner: "N .......... Humes, E & W .......... Thompson, S...... Davis, Twp. 8, Range 1 E, 66 acres", under the name of the owner as James Humes.

It will be seen that this is a description by reference to adjoining lands. That may be done. Such descriptions are not void. In Patton on Titles, pages 272-273

it is said: "Lands are also described by reference to adjoining lands. When the line of an adjoining tract of land is used as a call in a conveyance, the tract whose line is so used may be designated in the deed by any form of expression definitely indicating its identity, such as the name by which it is commonly known, or the name of its owner, or its former owner", and "In certain portions of the south, and to a limited extent elsewhere such descriptions are used without giving any distance, or even abbreviated to read 'west by Street, North by Smith, east by Jones, south by Rowe.' Acceptance of such descriptions must be based upon the rule that a description is certain which can be made certain."

In 26 C. J. S., page 215, appears this statement: "Again land may be described as bounded by natural or artificial objects, as adjoining lands of certain persons * * *".

16 Am. Jur. 590 announces the rule in these words: "A description of lands adjoining on all sides the land conveyed will enable the latter to be identified. Such a description may be made by any form of expression definitely indicating the identity of such adjoining lands, such as the name by which they are commonly known, the name of the owner or former owner * * *".

In Thompson on Real Property, Vol. 6, pp. 473-474, it is said: "A deed is not void for uncertainty of description if it furnishes a key to the identification of the land intended to be conveyed by the grantor. It may constitute a sufficient description of the land conveyed to state that it is bounded by or adjoining lands belonging to named persons."

Such is the rule in Mississippi. Carmichael v. Foley, 1 Howard 591; Lochte v. Austin, 69 Miss. 271, 13 So. 838; Bynum v. Stinson, 81 Miss. 25, 32 So. 910; Herod v. Robinson, 149 Miss. 354, 115 So. 40; Carrere v. Johnson, 149 Miss. 105, 115 So. 196; Beasley v. Beasley, 177 Miss. 522, 171 So. 620.

Section 9772, Miss. Code 1942, setting forth the requirements for making up the land rolls, provides that where lands are not surveyed according to the government surveys by designation used on the government maps, they may be described "by other description or names by which they may be distinguished * * *".

Section 9773, Code 1942, provides that "A failure to observe the requirements of the last preceding section shall not vitiate any assessment, if the land be so described as to be identified; and it shall be sufficient identification * * *" if described "by the name by which it may be known; or by any description which will furnish a sure guide for the ascertainment by parol evidence of the particular land intended". For a full discussion of the competency of extrinsic evidence to aid in the description see Jefferson v. Walker, 199 Miss. 705, 24 So. 2d 343, and Stockstill v. Bennett, 215 Miss. 417, 61 So. 2d 154; Loper v. Hinds Land Company, 214 Miss. 614, 58 So. 2d 88.

The following extrinsic evidence was admitted in this case: A public plat of Township 8, Range 1 East, was made in 1842 and certified by the State Land Commissioner. The land in question seems to be located in the Spanish Grant part of the country. The sections are all irregular. They are of varying shapes and sizes. The acreage composing the sections runs from twelve to fifteen hundred acres. The only section on this township plat which appears to be regular in shape and size contains 579.83 acres. Under the conditions there could be no descriptions by governmental subdivisions. Sixty-five per cent of the lands in the county are described on the tax rolls, as well as in conveyances, by reference to adjoining lands.

The assessment rolls of adjoining owners to the land here in dispute were introduced. These descriptions referred to the land in controversy as adjoining and bounding those lands.

In addition to this, oral testimony by the tax assessor and others, identifying the adjoining owners to the lands in question, was introduced. In other words, this testimony identified all persons who owned adjoining lands on all sides of the lands in question. This testimony identified Humes on the north, (incidentally the wife of complainant), Thompson on the east and west, and Davis on the south of this sixty-six-acre tract. The description on the rolls contained the clue to that.

The assessor testified he could take the description in this assessment and locate and go upon the sixty-six-acre tract. It will be noted the section is not stated. Notwithstanding that the assessor said he could locate the said lands—that the tract in controversy, surrounded as it was by other designated lands, would be the only tract of that size so surrounded in the township.

It was further shown that this tract of land had been assessed in the same manner for many years, naming James Humes as the owner.

Also tax receipts, showing the payment of taxes by James Humes, were introduced.

Other tax receipts, showing James Humes as owner, and also showing the valuation, both for county tax and bond interest and state and county general tax, the description as heretofore set out, with notations thereon to the effect that the lands sold for taxes to Krauss and Halford were introduced.

The land could not be described by Governmental subdivisions—there were no such descriptions in the township—nor could they be placed on the rolls under the description in the deed. That was entirely impracticable.

All of the foregoing testimony was competent. It made definite the description of the land in controversy. So far as concerns the description the tax sales were valid, although, it may be noted, it is only necessary, in order to vest title in appellees, to hold as valid the sale in 1937.

320

Appellants ably argue other contentions bearing upon the validity of the tax sales. We have carefully examined and considered all. of them and we find no reversible **error.**

Affirmed.

*Lee, Arrington, Ethridge* and *Gillespie, JJ.,* concur.