# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 92-CA-00950-SCT

*IN RE: ESTATE OF JAMES HENRY MASK,*
*DECEASED, JOHNNY MASK AND RICKY MASK, CO-*
*EXECUTORS: RICKY MASK AND DORIS JOAN*
*MASK, ADMINISTRATRIX C.T.A. OF THE ESTATE*
*OF JOHNNY MASK*

*v.*

*VERA ELROD, LINDA TRIMBLE, KATHY BARNETT*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 05/22/92 |
| TRIAL JUDGE: | HON. JAMES LAMAR ROBERTS, JR. |
| COURT FROM WHICH APPEALED: | PONTOTOC COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | W. P. MITCHELL |
| | STEPHEN H. MORRIS |
| ATTORNEY FOR APPELLEES: | GENE BARTON |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS AND ESTATES |
| DISPOSITION: | REVERSED AND REMANDED - 12/22/97 |
| MOTION FOR REHEARING FILED: | 8/15/96 |
| MANDATE ISSUED: | 2/23/98 |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. The present case was considered by this Court in ***Estate of Mask v. Elrod,*** No. 92-CA-00950 (decided August 1, 1996). After full consideration, we grant the contestants' Motion for Rehearing. The original opinion is withdrawn and the following opinion substituted therefor.

¶2. This is a will contest wherein the issue to be determined is whether the testator possessed testamentary capacity at the time that the will was made. The jury found that he did not. We conclude that it was error for the chancellor to allow evidence of the factfinder's decision in a previous hearing to continue the testator's conservatorship. We cannot say with confidence that this error was harmless and, therefore, we reverse the judgment and remand for a new trial.

### I.

¶3. James Henry Mask ("Mask") was born in September, 1898, and died in April, 1990. During his life he amassed a significant estate composed of real property, primarily farmland, and personal property in the form of certificates of deposit and bank accounts.

¶4. Mask suffered a stroke in March of 1985. Shortly thereafter, Vera Elrod and her husband, Junior, moved into Mask's home to take care of him. Vera Elrod and her two nieces, Linda Trimble and Kathy Barnett, sought conservatorship proceedings against Mask in June of 1985. Mask employed an attorney to contest the establishment of a conservatorship, but he evidently consented to the appointment of a conservator without a trial. The Chancellor accepted Mask's consent and established the conservatorship, appointing Vera Elrod and Johnny Mask, Mask's daughter and son, as conservators.

¶5. The record is unclear concerning the precise grounds for the conservatorship. After the conservatorship was established, disagreements developed between Vera and Johnny as to the management of their father's estate. At Mask's request, the chancellor eventually removed Vera and Johnny as conservators and appointed the Peoples Bank & Trust Company as conservator of his estate.

¶6. Almost two years later, in May of 1987, a hearing was held to terminate the conservatorship, ostensibly at the request of Mask. Testimony at the second conservatorship proceeding revealed that Mask had difficulty speaking, was confused, and had made uncharacteristically expensive purchases following his stroke in March of 1985. In the proceedings, Mask revealed that he did not know in which year he was born and that he did not know who his lawyer was. The chancellor found that there had been no change in Mask's physical or mental condition warranting removal of the conservatorship, even though Mask no longer consented to being under a conservatorship.

¶7. On April 25, 1990, Johnny Mask and Ricky Mask filed a petition seeking admission to probate the will of James Henry Mask in common form in the Chancery Court of Pontotoc County, Mississippi. Mask had executed this will on February 22, 1988, leaving property to Johnny Mask, his son, Ricky Mask and Larry Jenkins, his grandsons, and Allison Kelly and Kitty Russell, two of his granddaughters. On May 16, 1990, a contest to the will was filed by Vera Elrod, Mask's daughter, and Kathy Barnett and Linda Trimble, two granddaughters, asserting that Mask lacked the mental capacity to make a will and/or that he was unduly influenced by his son, Johnny Mask. The proponents of the contested will are Ricky Mask and Doris Joan Mask, administratrix of the estate of Johnny Mask.

¶8. The will contest was heard before a jury on May 4-6, 1992. During the course of the trial, the proponents stipulated as to Mask being under a conservatorship, but vehemently objected, via a Motion in Limine and through oral arguments, to the contestants reproducing proof from the conservatorship proceedings, including Mask's testimony by transcript. The motion was overruled.

¶9. At trial, the contestants of the will tried to establish that the will in question was inconsistent with Mask's prior stated intentions with regard to the testamentary disposition of his property. Mask's grandson, Larry Jenkins, who was a beneficiary in the will at issue in the case, testified against his interest on behalf of the contestants. The sole expert witness presented by the contestants was Dr. Kenneth Gaines. Deposition testimony of Dr. Gaines revealed that he was Mask's treating neurologist at the time of the stroke. He stated that Mask's symptoms following his stroke included loss of

speech, loss of ability to understand written and spoken language, and loss of the ability to make understandable language. The deposition revealed, however, that Dr. Gaines did not treat Mask after May, 1986, which was almost two years prior to the drafting of the will in question in February, 1988. Dr. Gaines stated that he would be surprised if Mask had improved to the point that he no longer needed a conservatorship as of the date of the will, given his advanced age. Dr. Gaines declined to venture an opinion, however, concerning Mask's testamentary capacity at the time of execution of the will.

¶10. The proponents introduced a report by psychologist Dr. Mike Oliver, who stated that Mask displayed significant improvement in his cognitive skills by December, 1986, several months after Dr. Gaines' final examination of Mask. Dr. Oliver's report further stated that "the deficits that he had in the past which concerned me most in terms of his independence, primarily language and reading skills, no longer appear to be significant problems." During Dr. Gaines' transcript testimony, a hospital report from a Dr. Zurawski, who treated Mask in August, 1989, seven months prior to his death was introduced. This report stated that "this is an older white male who is rather animated for his stated age of 91. His thinking was clear and concise and appropriate."

¶11. The proponents also presented the testimony of Mask's neurologist, Dr. Luther Stumme. Dr. Stumme testified that, although a portion of a person's brain can die from a stroke, there are other neurons, or other pathways, in which communication ability can be developed so that a person can "function again in a useful capacity." Dr. Stumme testified that Mask suffered in only a small portion of his brain and was capable of making a will, although he had expressed a different opinion in 1986. Importantly, Dr. Stumme treated Mask from October, 1986 until his death in 1990.

¶12. Vicki Price, Mask's speech pathologist, testified that, while Mask had difficulty in speaking after the stroke, such difficulty should not be confused with difficulty in understanding, and that, in her opinion, Mask was mentally capable of executing a will in the year following his stroke in March, 1985.

¶13. Sue Collins, First Vice-President at Peoples Bank & Trust Company where Mask did business, testified on behalf of the proponents that she had known Mask for thirty years and continued to see him once or twice a month following the stroke. Collins testified that she noticed Mask had problems with his speech, but that once she talked with him a few minutes he would calm down and "you wouldn't really even notice this." Collins testified that she had no doubt that Mask had the mental ability to knowingly and understandingly execute a will. Cross-examination of Collins, however, disclosed that she was a close personal friend of JoAnn Mask, who was a beneficiary under the contested will. Cross-examination also revealed that W.P. Mitchell, the proponents' attorney, represented Peoples Bank and was chairman of the board of that bank.

¶14. L.F. "Sandy" Sams, Mask's attorney who was employed to draft the contested will, testified that Mask had indicated that he was improving from the stroke and wanted "out from under the conservatorship." Sams confirmed Collins' testimony that Mask had a "hesitancy" in his speech and that he would stutter if he was rushed. Sams testified that he would not have drawn the will if he had not been satisfied that Mask was capable of understanding what he wanted to do with his property. Shellaine Shappley, Sams' secretary who served as a subscribing witness, similarly testified that Mask had the mental capacity to knowingly and understandingly execute the will at the time she saw him

sign it.

¶15. James Homan, a nephew of Mask who brought Mask to Sams' office to execute the will, testified for the proponents that he saw Mask fairly regularly up until his death. Homan testified that he did not believe that Mask needed a conservator and stated that Mask was "clear and concise" and "perfectly competent to execute a will."

¶16. At the close of the testimony, the Chancellor directed a verdict in favor of the proponents with regard to the issue of undue influence, but allowed the jury to consider the issue of testamentary capacity. The jury unanimously found for the contestants on the basis of lack of testamentary capacity on the part of Mask, upon which the chancellor entered a decree setting aside the will. The proponents filed a Motion for Judgment Notwithstanding the Verdict of the Jury and a Motion for a New Trial, both of which were denied. Thereafter, the proponents timely perfected this appeal.

## II.

¶17. This Court has repeatedly held that the test of one's capacity to execute a will is "the ability [of the testator at the time] to understand and appreciate the nature and effect of [his] act . . . the natural objects [or persons to receive his] bounty and their relation to [him], and that [he is] able to determine what disposition [he] desire[s] to make of [his] property." *Matter of Will of Wasson,* 562 So. 2d 74, 77 (Miss.1990); *Matter of Estate of Edwards,* 520 So. 2d 1370, 1372 (Miss. 1988); *Humes v. Krauss,* 221 Miss. 301, 310, 72 So. 2d 737, 739 (1954). *See also Young v. Martin,* 239 Miss. 861, 871-72, 125 So. 2d 734, 738 (1961);*Wallace v. Harrison,* 218 Miss. 153, 164, 65 So. 2d 456, 459-60 (1953); *Cowart v. Cowart,* 211 Miss. 459, 462, 51 So. 2d 775, 776 (1951); *Fortenberry v. Herrington,* 188 Miss. 735, 746-7, 196 So. 232, 236 (1940); *Moor v. Parks,* 122 Miss. 301, 334, 84 So. 230, 238 (1920).[1] Such capacity "is to be tested as of the date of the execution of the will." *Scally v. Wardlaw,* 123 Miss. 857, 878, 86 So. 625, 626 (1920).

¶18. While certain factual circumstances may provide evidence both of a need for a conservatorship and a lack of testamentary capacity on a particular date, it is not the case that a conservatorship necessarily deprives an individual of testamentary capacity. *Lee v. Lee,* 337 So. 2d 713, 715 (Miss. 1976) Even where a conservatorship is granted for reasons having to do with the testator's mental instability, we do not now question the proposition that a person under a conservatorship may have "lucid intervals" during which he may validly execute a will. *Gholson v. Peters,* 180 Miss. 256, 267, 176 So. 605, 606 (1937); *Lum v. Lasch,* 93 Miss. 81, 87, 46 So. 559 (1908).

## III.

¶19. The record reveals that there was much conflicting evidence regarding Mask's mental capabilities around the time he executed his will, and thus it was properly a question for the jury to determine Mask's testamentary capacity. That does not end the matter, however, for in the trial below the chancellor admitted potentially prejudicial evidence of the May, 1987, hearing at which the issue was whether to continue Mask's conservatorship.

¶20. At the outset we note that the conservatorship evidence was utilized in various ways at the trial below. First, the fact that a conservatorship existed was introduced by the contestants as proof that Mask was not of sound mind when he executed the will. Second, various witnesses were allowed to

respond to questions concerning evidence before the court in the prior conservatorship hearing and the decision of the chancellor in response to that evidence. Third, the trial court allowed the transcript of Mask's testimony from the hearing to be read into evidence. We analyze each category of evidence under our rules.

**1. Whether the Chancellor Erred in Allowing Evidence of the Fact that a Conservatorship Existed.**

¶21. The fact that Mask was under a conservatorship was offered by the contestants as evidence that Mask did not have testamentary capacity when he executed the will. Under the law, a conservatorship may be granted for many reasons, including those related to advanced age, physical incapacity or mental weakness. Miss. Code Ann. § 93-13-251 (1994). While some of these reasons for granting a conservatorship are relevant to testamentary capacity, it should be clear that, given the fact that some are not, it is not the fact of the conservatorship itself but the *circumstances* surrounding the conservatorship that are relevant to the issue of testamentary capacity.

¶22. In ***Harvey v. Meador,*** 459 So. 2d 288, 291-92 (Miss. 1984) this Court noted that the legislature provided the mechanism of conservatorship for supervision of estates of older adults with physical incapacity or mental weakness, without the stigma of legally declaring the person non compos mentis. This mechanism was intended for a broader class of people than the incompetent and the mental weakness spoken of in the statute may be different than that necessary for a declaration of incompetency.

¶23. In the case below the fact that a conservatorship existed was not a contested evidentiary issue, since the proponents offered to stipulate to this fact in their motion in limine, and repeated their willingness to do so at the pretrial hearing on this motion. However, it is appropriate that this Court make a decision as to whether the fact of the conservatorship is admissible on remand. We think that it is not.

¶24. Prior judgments may have legal significance or evidentiary significance with respect to subsequent collateral proceedings. Their legal significance is limited to the doctrines of res judicata and collateral estoppel, neither of which is applicable here. As evidentiary matters they are hearsay to the extent that they are offered to prove facts which are essential to the judgment. That is, a judgment says something about the existence of certain facts; to the extent that a judgment is offered to prove those facts, it is a declaratory statement other than one made by a declarant testifying at trial, offered to prove the truth of the matter asserted. Miss. R. Evid. 801(c).

¶25. Our rules provide two exceptions for the admissibility of prior judgments as evidence on the merits. One of these involves criminal felony judgments only. Miss. R. Evid. 803(22). The sole exception for civil judgments is Rule 803(23), which provides that the hearsay rule does not exclude "[j]udgments as proof of matters of personal, family or general history, or boundaries, essential to the judgment, if the same would be provable by evidence of reputation." Miss. R. Evid. 803(23).[2] The matters provable by reputation are laid out in Rule 803(19), and include facts concerning a person's "birth, adoption, marriage, divorce, death, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of his personal or family history." Miss. R. Evid. 803(19). However, conditions of health, either mental or physical, do not appear to be within the scope of these rules, as they have more to do with legal status in relation to another.[3] Rule 803(23) does not apply to the

previous chancellor's judgment that Mask was unable to handle his own affairs. Thus, we conclude that on remand the fact of Mask's conservatorship is not admissible evidence.

## 2. Whether the Chancellor Erred in Allowing Testimony Concerning the Rejection of Certain Evidence by the Court in the Previous Conservatorship Hearing.

¶26. This issue is related to the admissibility of the judgment already discussed, though it deals more specifically with the previous chancellor's reaction to particular evidence which was before him in the prior proceeding. Four of the proponents' witnesses, including Sue Collins, Dr. Stumme, Vicki Price and James Homan, had testified for Mask at the 1987 hearing on whether Mask's conservatorship should be terminated. At the trial here under consideration, they were cross-examined by contestants' counsel as to whether the chancellor in the previous hearing had rejected their similar testimony there and determined that Mask's conservatorship should be continued. Thus, the jury was exposed to the prospect of accepting or rejecting evidence which it was told was accepted or rejected on a previous occasion by a judge.

¶27. Our first inquiry concerns whether this evidence of the previous court's decision to reject certain evidence and continue Mask's conservatorship was relevant to the issue of Mask's testamentary capacity some nine months later. Under the rules, the concept of relevance is given a broad construction. Relevant evidence is that "'having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Bredemeier v. Jackson,* 689 So. 2d 770, 773 (Miss. 1997) (quoting *MidSouth Rail Corp. v. O'Connor,* 672 So. 2d 1176, 1182 (Miss. 1996)); Miss. R. Evid. 401. The comment to Miss. R. Evid. 401 notes that "[e]vidence is relevant if it is likely to affect the probability of a fact of consequence in the case." *See Mississippi State Highway Comm'n v. Dixie Contractors, Inc.,* 375 So. 2d 1202, 1205 (Miss. 1979).

¶28. In spite of this broad definition, it strikes this Court as irrelevant to show that some prior factfinder, whether judge or jury, did or did not accept certain evidence. We noted as much in *Sample,* 643 So. 2d 524, in which a criminal defendant charged with possession of illegal drugs sought to introduce evidence of a civil judgment in a previous forfeiture proceeding arising out of the same circumstances. In the civil proceeding, the trial court had ruled in favor of the defendant because the State failed to refute [the defendant's] claim that he had earned the money legitimately. *Id.* at 527. This Court refused to allow the defendant to introduce the evidence to prove that he was not involved in the drug trade, remarking that "[t]he fact the trial judge did not require Sample to forfeit a certain sum of money found inside his automobile would not have a tendency to make more or less probable his innocence of marijuana or cocaine possession." *Id.* at 528. Similarly, the conclusion by the chancellor that Mask was unable to attend to his affairs merely represents the opinion of a separate factfinder based upon evidence presented to him at that time, and does not make it more or less probable that Mask possessed testamentary capacity when he executed his will nine months later.

¶29. The issue before the court in the conservatorship hearing was whether Mask was generally capable of handling his business affairs alone, while the issue before the jury in the case below was whether Mask was mentally capable or whether he may have experienced a "lucid interval" on February 22, 1988, such that at that time he had testamentary capacity. Thus, evidence of the

chancellor's previous assessment of testimony before him with respect to the need for a conservatorship was of no moment to the subsequent factfinders. Moreover, any such determination was a conclusion reached based upon evidence presented by others, and as such, it is a form of hearsay.

¶30. The chancellor's acceptance or rejection of evidence proffered at the conservatorship hearing concerning Mask's ability to manage his affairs at that time was totally irrelevant to the task of the will contest jury to assess testimony from the same witnesses, even if identical in content, with regard to a determination whether Mask had testamentary capacity at the time that he executed his will.

### 3. Whether the Chancellor Erred in Allowing Mask's Testimony from the Conservatorship Hearing to be Read and Introduced into Evidence.

¶31. At the trial below, the chancellor allowed Mask's testimony from his conservatorship termination hearing to be read and introduced into evidence. In his testimony, Mask showed some signs of mental confusion, and at one point could not remember what year he was born. This evidence was introduced by the contestants to show that Mask was in a debilitated mental state at the hearing, and that therefore, the evidence had probative value for the issue of whether he had testamentary capacity nine months later. While evidence of lack of lucidity at a prior time is not dispositive of the issue of testamentary capacity at the time of execution of a will, it is certainly relevant to the decision to be made and sufficiently probative to allow a jury to draw inferences therefrom.

¶32. Unlike references to what the prior chancellor did or did not find with respect to the evidence before him, the testimony of Mask at the prior hearing was not hearsay, as the proponents argued in their brief. "Hearsay" is a statement, other than one by declarant while testifying in trial, offered to prove the truth of the matter asserted. Miss. R. Evid. Rule 801(c). If the significance of the statement is simply that it was made and there is no issue about the truth of the matter asserted, then the statement is not hearsay. Miss. R. Evid. 801 cmt.; *Eselin-Bullock & Assoc. Ins. Agency, Inc. v. National General Ins. Co.,* 604 So. 2d 236, 242 (Miss. 1992).

¶33. At Mask's conservatorship hearing, he was asked such questions as what his name was, when he was born, what the purpose of the hearing was, and what he would do with his money if he were given control of it. These questions were not designed to elicit answers to the actual questions asked of Mask, but to determine his mental and physical competence to handle his business affairs. The reading of this testimony was offered at the proceeding below for similar reasons, namely, to persuade the jury that Mask was mentally debilitated on the day the hearing took place and was therefore probably not capable of executing a will nine months later. Thus, the statements were not offered to prove the truth of the matter asserted. Moreover, they were relevant, since the jury could draw reasonable inferences based on the transcript's reflection of Mask's mental condition nine months before he executed his will.

¶34. The determination of relevancy is left to the sound discretion of the trial court, "whose determination will not be reversed in the absence of clear abuse." *Bredemeier,* 689 So. 2d at 773; *Watts v. State,* 635 So. 2d 1364, 1367 (Miss. 1994). The chancellor made no error in allowing Mask's testimony to be read into the record.

**IV.**

¶35. Error is reversible only where it is "of such magnitude as to leave no doubt that the appellant was unduly prejudiced." *Davis v. Singing River Elec. Power Ass'n,* 501 So. 2d 1128, 1131 (Miss. 1987). Where error involves the admission or exclusion of evidence, we will not reverse unless the error adversely affects a substantial right of a party. *Terrain Enterprises, Inc. v. Mockbee*, 654 So. 2d 1122, 1131 (Miss. 1995).

¶36. We cannot conclude with confidence that the numerous references to the previous judge's decision to continue Mask's conservatorship did not unduly prejudice the proponents' case. Indeed, the overwhelming proof presented by those in a position to observe Mask at the time that he made the will, including proof from the attorney who drew the will, and the physician who treated him through death is to the effect that Mask had testamentary capacity. The most salient proof to the contrary in support of the jury's conclusion is the evidence concerning the conservatorship, including Mask's testimony at the conservatorship hearing.

¶37. As we have suggested, reasonable inferences may be drawn from the circumstances surrounding the conservatorship, as well as Mask's behavior at the hearing to terminate it, and such evidence is thus relevant to the issue of his testamentary capacity. However, the issue of testamentary capacity on the day Mask executed his will remains legally and factually distinct from the decisions to establish and continue his conservatorship. As *Lee* suggests, there is a subtle distinction between the mental capacity required to manage one's affairs and that required to execute a will, and the precise issue as to testamentary capacity is the testator's mental competency at the time the will is made. *See Lee,* 337 So. 2d at 715. The wrongfully admitted evidence of a judge's determination in a case founded upon similar factual predicates has enormous potential for unduly influencing a lay jury. We therefore agree with the proponents that the jury in this case could easily have been misled into thinking that a prior judicial determination of lack of testamentary capacity had been made by the judge in the previous hearing.

## V.

¶38. For the foregoing reasons, we reverse and remand for proceedings consistent with this opinion.

**¶39. REVERSED AND REMANDED.**

**PRATHER, P.J., AND SMITH, J., CONCUR. LEE, C.J., CONCURS IN RESULT ONLY. PITTMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND McRAE, J. ROBERTS AND MILLS, JJ., NOT PARTICIPATING.**

**PITTMAN, JUSTICE, DISSENTING:**

¶40. The majority recognizes that a conservatorship limits the contractual and conveyance powers of its ward. *See Lee v. Lee*, 337 So. 2d 713, 714 (Miss. 1976). To further say, as *Lee* does, that it does

not restrict the ward's right, competency, or power to execute a will is an anomaly. *Id*. If one is judicially declared incapable of handling his affairs, and therefore cannot enter contracts, deed property or even endorse checks, ***Great Southern Nat'l. Bank v. Minter***, 590 So. 2d 129, 132 (Miss. 1991), it defies reason to say that such a person is capable of drawing an instrument disposing of his entire estate at death. While I am aware of no law supporting this position, it is apparent on its face. I would overrule ***Lee*** and affirm the jury's verdict in this matter. Accordingly, I dissent.

**SULLIVAN, P.J., AND McRAE, J., JOIN THIS OPINION.**

1. Miss. Code Ann. §  91-5-1 (1994) provides that "[e]very person eighteen (18) years of age or older, being of sound and disposing mind," shall have power to execute a will.

2. Weinstein notes that under the federal rules, "[p]rior civil judgments are inadmissible, except to the limited extent provided by the exception for judgments as to personal, family or general history or boundaries . . . . Civil judgments are not given evidentiary effect because the lower burden of proof makes them less reliable than criminal judgments." 5 Jack B. Weinstein, Weinstein's Federal Evidence, § 803.28[2] (2d ed. 1997). *See also **New Mexico v. Hoeffel,*** 815 P.2d 654, 656 (noting that "there appears to be little support for the use of civil judgments as evidence of the facts found" and listing policy reasons for this rule).

In one limited context, this Court has recognized that determinations by factfinders in previous non-criminal proceedings may be used as evidence in subsequent proceedings. In ***Daniels by Glass v. Wal-mart Stores, Inc.,*** 634 So. 2d 88 (Miss. 1993), a youth was determined to be a delinquent under the Youth Court Act, apparently as a result of a shoplifting incident at a Wal-Mart store. The juvenile court order was held admissible in a subsequent slander suit brought by the youth. However, it should be noted that the adjudication of a minor as a delinquent must be established beyond a reasonable doubt, rendering the weight of such adjudications the same as that in criminal convictions. Moreover, ***Daniels*** has been narrowly construed by this Court, in that it "stands only for the narrow proposition that a juvenile adjudication is admissible on the issue of character where that trait is at issue, such as, for example, in a slander suit." ***Sample v. State,*** 643 So. 2d 524, 528 n.1 (Miss. 1994).

3. Statements of personal or family history are admitted because of the probability that the "natural effusions" of those who talk over family affairs when no special reason for bias or passion exists are fairly trustworthy. 5 John Henry Wigmore, Wigmore on Evidence (3d Ed.) § 1482 (1974).