DIAZ, J., for the Court:
¶ 1. Helen Winans appeals a December 23, 1996 decision of the Warren County Chancery Court declaring void the new will executed by B.Z. Byrd on February 3, 1992. The record supports the chancellor’s finding that Byrd lacked testamentary capacity to make a new will because of the totality of circumstances surrounding the medical condition from which he was suffering at the time and the effects of the drugs used to control his symptoms. Ac *1216 cordingly, we affirm the decision of the court below.
FACTS
¶ 2. B.Z. Byrd, a Vicksburg sign painter, executed a will on July 25, 1991. He made specific bequests to his sister and nephew and left the residual of his modest estate to his adopted son, Elvin O’Neil Byrd. Elvin also was named in the will as executor of the estate. On February 3, 1992, however, Byrd met with his attorney and friend for more than fifty years, Burkett H. Martin. He executed a new will naming Helen Winans, a family friend, as executrix and leaving the residual of the estate to Mrs. Winans and her husband, Richard Winans.
¶ 3. Six days before executing his new will, Byrd had been taken to the emergency room at the Columbia-Vicksburg Medical Center because he was hallucinating and behaving irrationally. Dr. Mike Davis, his regular physician, had prescribed some medication to calm him. On January 28, 1992, he referred Byrd to Dr. James Flanders, who saw Byrd and talked extensively with Byrd’s family about the symptoms Byrd had displayed. The next day, Byrd was taken to the VA Hospital, but would not stay for any further evaluation. Dr. Flanders testified that Byrd’s thought processes at the time were “pretty blatantly psychotic.”
¶4. Family members testified that the usually genteel and mild-mannered Byrd had become violent and belligerent, demonstrating a variety of increasingly frightening symptoms, after a bout of the flu. He talked of seeing spiders and light bulbs and warned them that everything was “programmed.” His sisters became especially concerned when Byrd, a meticulous draftsman and speller from his years as a sign painter, drew a lined diagram punctuated with shakily-written and mis-spelled words, and told them it was his will.
¶ 5. Although Byrd refused to be admitted to the hospital, his sisters stayed with him and home health nurses monitored his progress and medication on a daily basis. Nurse Mary Ann Haley’s notes from January 31, 1992, indicate that Byrd was disoriented, anxious, confused and forgetful. Her notes further stated that he was “not able to carry on conversation [and] can not remember any of details concerning hosp. stay.” Nurse Virginia Stanley’s comments for the same day state “pt. becoming more confused and on occasion angry and unreasonable. Easily agitated. Short term memory worsening. Unable to care for self or stay alone.”
¶ 6. On February 1, 1992, Nurse Jeanine Field’s assessment of Byrd’s condition noted that “Pt. is more calm and oriented today after two days of Haldol. No irrational behavior in past 12 hours.” Her notes for February 2 further indicate that “Pt. is calm, alert. Appears to be responding well to Haldol.” Mary Ann Haley’s notes from February 3 state that Byrd was alert but forgetful and that an additional medication, Haloperidal, had been prescribed. She testified that she had been pleased that Byrd recognized her that day, adding, “the medication was doing what it was supposed to do.” Her notes from February 4 and 5 indicate that he was alert and feeling better.
¶ 7. Byrd remained under the constant care of his family for the next several months. The daily progress notes of the home health care nurses indicate that he continued to suffer bouts of confusion, depression and forgetfulness. He remained weak and sometimes experienced dizziness, tremors and tingling. He was discharged from home health care on June 24, 1992. He continued to grow stronger and returned to painting signs. His nephew, John Byrd, Jr., testified that Byrd later told him, “ ‘Son — he called me ‘Son’ all the time — ’92 was a tough year for me. I couldn’t tell you what all went on, but it was a tough year for me.’ ”
¶ 8. Byrd died on August 8, 1995. By decree dated January 8, 1996, the February 3, 1992 will, filed by Mrs. Winans was *1217 entered into probate in the chancery court of Warren County. On April 8, 1996, Elvin O’Neill Byrd filed an objection to probate, asserting that the July 25, 1991 will, and not the later will, was Byrd’s last will and testament. He alleged that the later will was the result of undue influence by Mrs. and Mrs. Winans and that it had not been properly executed or witnessed.
¶ 9. A hearing was held on November 19, 1996. The chancellor found that the later will had been properly executed and witnessed and that the Winanses had not exerted undue influence upon the elder Byrd. However, looking at the totality of the circumstances, particularly Mr. Byrd’s mental state in the days preceding his meeting with his attorney, the chancellor found that Byrd lacked testamentary capacity and the will was void. An order declaring the will void was entered on December 28, 1996. Aggrieved by the decision, Mrs. Winans now asks this Court to consider whether the chancellor erred in finding that B.Z. Byrd lacked the testamentary capacity to execute a will on February 3,1992.
DISCUSSION
I. WHETHER THE CHANCELLOR ERRED IN FINDING THAT B.Z. BYRD LACKED TESTAMENTARY CAPACITY TO EXECUTE A WILL ON FEBRUARY 3,1992.
¶ 10. In her sole assignment of error, Helen Winans asserts that the chancellor erred in finding that on February 3, 1992, Byrd lacked the testamentary capacity to execute a will. She argues that only the testimony of Byrd’s attorney, Burkett Martin, with whom he met to change his will, is of any legal significance and discounts the evidence of Byrd’s state of confusion during the week prior to that date, as well as evidence of the effects of the medication he was taking to control the symptoms from which he had been suffering. Elvin O’Neill Byrd, on the other hand, counters that the chancellor properly considered the totality of the circumstances of his adoptive father’s mental condition in the days preceding the meeting with his attorney, including the testimony and notes of the home health care nurses who had been evaluating his progress and administering medication to him on a daily basis.
¶ 11. The Mississippi Supreme Court has held that the test of one’s capacity to execute a will “is the ability of the testator at the time to understand and appreciate the nature and effect of his act, the natural objects or persons to receive his bounty, and their relation to him, and is capable of determining what disposition he desires to make of his property.” Edwards v. Edwards, 520 So.2d 1370, 1372 (Miss.1988)(quoting Humes v. Krauss, 221 Miss. 301, 310, 72 So.2d 737, 739 (1954)). Testamentary capacity “is to be tested as of the date of the execution of the will.” Scatty v. Wardlaw, 123 Miss. 857, 878, 86 So. 625, 626 (1920). While the proponents carry the burden of proof at trial, “the burden of going forward with proof of testamentary incapacity shifts to the contestants, who must overcome the prima facie case.” Edwards, 520 So.2d at 1372. “In short, the proponents must prove the testator’s testamentary capacity by the preponderance of the evidence.” Id.
¶ 12. We acknowledge that even though a testator may not always possess testamentary capacity, he may be found competent to execute a valid will during a period of lucidity. Edwards, 520 So.2d at 1373; Lee v. Lee, 337 So.2d 713, 715 (Miss.1976). However, only days before meeting with his attorney, Byrd had been taken to the emergency room with symptoms described by Dr. Flanders as “pretty blatantly psychotic.” His condition was so serious that he could not be left alone, and indeed, required the services of sitters and a home health nurse through May 1992. On February 3, 1992, he appeared alert but forgetful and was heavily sedated with Haloperidol, an anti-psychotic drug.
*1218 ¶ 13. The Mississippi Supreme Court has held that the testimony of subscribing witnesses “is entitled to greater weight than the testimony of witnesses who were not present at the time of the will’s execution or did not see the testator on the day of the will’s execution.” Edwards, 520 So.2d at 1373. Thus, Winans argues, greater weight should be given to the testimony of Mr. Martin, who stated that Byrd had seemed fine when they met on February 3. He had no knowledge at the time of Byrd’s illness or recent hospitalization. However, Mary Ann Haley, the home health nurse who saw Byrd on the day he executed his new will, testified that she was pleased that Byrd even recognized her that day. Her notes from her February 3 visit with Byrd indicate that he was alert but forgetful and seemed calmer. As she stated, “the medication was doing what it was supposed to do.” She further testified that when patients like Byrd are sedated, they are not allowed to sign medical documents or authorizations, even in an emergency situation. We see no reason why this evidence should be given less weight than Mr. Martin’s testimony.
¶ 14. This Court will not disturb the chancellor’s findings when they are supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. Bowers Window and Door Co., Inc. v. Dearman, 549 So.2d 1309 (Miss.1989). We consider the entire record before us and accept all those facts and reasonable inferences therefrom which support the chancellor’s findings. Madden v. Rhodes, 626 So.2d 608, 616 (Miss.1993). She was in the best position to determine the credibility of the witnesses, and we will not undermine authority of the lower court by replacing the chancellor’s judgment with our own. Madden, 626 So.2d at 616. Looking at the record now before us, we find no abuse of discretion or error in the chancellor’s determination that B.Z. Byrd lacked testamentary capacity to execute a new will on February 3, 1992. She properly considered not just the testimony of Byrd’s attorney but also the testimony of the home health nurse and her notes from her February 3 visit with Byrd. In light of that evidence as well as of B.Z. Byrd’s condition in the days before he executed his will and the medication he was taking, Mrs. Winans failed to meet her burden of proof. Accordingly, we affirm the chancellor’s decision.
CONCLUSIONS
¶ 15. The evidence in the record supports the chancellor’s determination that B.Z. Byrd did not have the testamentary capacity to execute a new will on February 3,1992. We therefore affirm the chancellor’s decision declaring the will void.
¶ 16. THE JUDGMENT OF THE CHANCERY COURT OF WARREN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR. IRVING, J., NOT PARTICIPATING.