# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-01926-SCT

*CLAUDIA A. LIMBERT, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY; MISSISSIPPI UNIVERSITY FOR WOMEN AND BOARD OF TRUSTEES OF MISSISSIPPI STATE INSTITUTIONS OF HIGHER LEARNING*

*v.*

*MISSISSIPPI UNIVERSITY FOR WOMEN ALUMNAE ASSOCIATION, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/28/2007 |
| TRIAL JUDGE: | HON. DOROTHY WINSTON COLOM |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | J. CAL MAYO, JR. |
| | PAUL B. WATKINS, JR. |
| | DAVID L. SANDERS |
| ATTORNEYS FOR APPELLEES: | JULIE LEMAYE HUSSEY |
| | KIMBERLY GOLDEN GORE |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND RENDERED - 11/20/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.    Dr. Claudia A. Limbert, the Mississippi University for Women (MUW), and the Board of Trustees of Mississippi State Institutions of Higher Learning (IHL),[1] appeal to us from an October 1, 2007, injunction wherein the Lowndes County Chancery Court ordered

---

[1]Dr. Limbert, MUW, and IHL are sometimes referred to herein collectively as "Appellants."

Dr. Limbert to continue to honor the October 25, 2006, affiliation agreement between the Mississippi University for Women Alumnae Association (Association) and MUW, and that Dr. Limbert do so in good faith for the duration of the agreement. The injunction further ordered rescission of any affiliation agreements made by Dr. Limbert and IHL with any other alumni group. The Appellants likewise assign as error the chancery court's denial of injunctive relief, which had the practical effect of allowing the Association's continued use of the University's names, marks, and symbols following termination of the affiliation agreement.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT[2]

¶2.     The relationship between the Association and the MUW has existed for more than one hundred years. According to MUW President Limbert, this relationship between the Association and MUW became strained as soon as she was hired in 2002.[3]

---

[2]The facts in today's case are mostly gleaned from the Opinion and Judgment entered on October 1, 2007, by the Chancery Court of Lowndes County.

[3]Dr. Limbert testified that before she arrived at the university, she was accompanied by Association members on the plane, each of whom had strong suggestions about whom she should discharge and whom she should hire. Furthermore, Dr. Limbert stated that she received multiple complaints from university departments stating that they did not want to work with the alumnae group. In Spring 2006, a controversy surrounding a university official, MUW Foundation Director Scott Rawls (hired by Dr. Limbert), surfaced. Alumnae leaders made various allegations of sexual harassment, racial discrimination, and theft against Mr. Rawls. This controversy involved a series of emails sent by alumnae. As a result, Dr. Limbert had the hard drives of the Office of Alumni Relations' computers copied. Dr. Limbert's testimony was that after a costly investigation by MUW, these allegations proved to be false. Moreover, Dr. Thomas Meredith, former IHL Commissioner, testified that various alumnae expressed to him a clear desire for IHL to terminate Dr. Limbert.

2

¶3. In August 2006, IHL mandated that all public universities in Mississippi enter into an operating agreement with its affiliated entities.[4] Among other things, IHL policy required that the operating agreements, and any changes to them, be reviewed by IHL. Under this provision, alumni associations are such entities. On October 25, 2006, Dr. Limbert entered into an affiliation agreement with the Association, which was approved by IHL. According to the testimony of Association President Betty Lou Jones, the Association had retained counsel prior to signing this agreement to aid in its negotiation and in response to MUW having retained counsel. This agreement contained a provision that required the Association to draft a new constitution and bylaws that met Dr. Limbert's approval, a provision that allowed the University Alumni Director to appoint members of the Association's nominations committee, and a provision that either party could terminate the agreement upon sixty days' notice. At the heart of the affiliation-agreement controversy between the parties was the provision in the agreement that gave the University Alumni Director the power to appoint members to the Association's nominations committee. Dr. Limbert sought to have this change to the electoral procedure reflected in the Association's constitution and bylaws. Dr. Limbert testified that this desired change stemmed from her disdain for the current nominations procedures that invariably kept the same small group of alumnae (whom she believed to be undermining the objectives of MUW) in positions of leadership. The Association, despite characterizing this provision as restrictive and punitive, signed the

---

[4]*See* IHL Policy 301.0806.

agreement. The Association submitted the proposed constitution and bylaws within the requisite sixty days, as required by the agreement. Negotiations regarding the constitution and bylaws continued by and through counsel through January 31, 2007. On February 1, 2007, Dr. Limbert, through counsel, sent a letter to the Association, giving it the requisite sixty days' notice to terminate the agreement, disaffiliating MUW and the Association.

¶4. An action was commenced on March 29, 2007, four days prior to the disaffiliation, via a complaint filed by "The National Executive Board" against Dr. Limbert, seeking a preliminary injunction to prevent the termination of the affiliation agreement. Dr. Limbert filed a motion to dismiss, alleging that The National Executive Board was not a legal entity, and thus no relief could be granted. In lieu of dismissing the complaint, the chancery court allowed the Association to amend its complaint and serve the proper parties.

¶5. On April 5, 2007, the Association filed an Amended Complaint for Preliminary Injunction, Permanent Injunction and Other Relief against the Defendants/Appellants Dr. Limbert and IHL. The Appellants filed their Answers and Motions to Dismiss. Additionally, Dr. Limbert, on behalf of MUW, filed a counterclaim seeking to enjoin the Association from using the name "Mississippi University for Women." The Association thereafter filed its Answer to the Counterclaim. Hearings were held on May 8, 2007, and June 5, 2007, on the request of both parties for permanent injunctions. At the conclusion of the hearings, the chancery court requested trial briefs, which were received on or before July 29, 2007.

¶6. The chancery court concluded that Dr. Limbert's decision to disaffiliate with the Association over its bylaws was in violation of IHL policy and was in bad faith. Therefore,

4

the chancery court, on October 1, 2007, entered "[a]n injunction mandating that Dr. Limbert uphold the existing and valid affiliation agreement between the Association and the University, dated October 25, 2006, and that Dr. Limbert operate under the affiliation agreement in good faith for the duration of the Agreement . . . ." In addition, the chancery court held "[s]ince the actions of Dr. Limbert in terminating the agreement were in bad faith, actions taken by her to form a new alumnae association and enter into a new affiliation agreement were also in bad faith." Thus, Dr. Limbert and IHL were "mandated to rescind any affiliation agreements made by Dr. Limbert with any other alumni group." Finally, the chancellor denied the injunctive relief requested by the Appellants.

¶7. On October 26, 2007, Dr. Limbert, MUW, and IHL appealed to this Court seeking relief from specific performance of the affiliation agreement and from the injunction from affiliating with any other alumni groups, as well as reconsideration of their motion that the Association be enjoined from using MUW's names, symbols, logos and/or marks.

## DISCUSSION

¶8. The Appellants present seven issues for review by this Court: (1) whether the constitutional principle of separation of powers prohibits a court from second-guessing a policy decision made by IHL and a public university concerning higher education administration; (2) whether the constitutional principle of separation of powers requires a court to defer to an executive-branch agency in the interpretation and implementation of that agency's rules and regulations; (3) whether a court can mandate that a public university president exercise her judgment in a particular matter concerning the goals and nature of the

5

university's relationship with affiliated entities; (4) whether a party to an agreement can act in "bad faith" if she is exercising a contractual right to terminate the agreement; (5) whether a university president can act in "bad faith" if her action was in the best interests of that university consistent with IHL's directions; (6) whether the chancery court improperly granted a specific-performance remedy where the contract required an ongoing, affiliated relationship between the parties as opposed to the occurrence of a particular act or transaction; (7) whether the chancery court failed to protect the university's property interest in its names, marks, and symbols.

¶9. Among these issues, we find two issues to be dispositive of today's case: (1) whether Dr. Limbert acted in bad faith by terminating the agreement and (2) whether the constitutional principle of separation of powers requires a court to defer to an agency's interpretation and implementation of its own rules and regulations. Accordingly, we will discuss only these two assignments of error.

   I.   **WHETHER A PARTY TO AN AGREEMENT CAN ACT IN "BAD FAITH" IF SHE IS EXERCISING A CLEAR CONTRACTUAL RIGHT TO TERMINATE THE AGREEMENT.**

¶10. In reviewing judgments of the chancery court, "[w]e will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, applied an erroneous legal standard, was manifestly wrong, or was clearly erroneous." *Hamilton v. Hopkins*, 834 So. 2d 695, 699 (Miss. 2003) (citing *Cox v. F-S Prestress, Inc.*, 797 So. 2d 839, 843 (Miss. 2001); *Holloman v. Holloman*, 691 So. 2d 897,

6

898 (Miss. 1996)).  On the other hand, the proper standard of review for issues of contract construction are questions of law that are reviewed *de novo*. ***Dixie South Indus. Coating, Inc. v. Miss. Power Co.***, 872 So. 2d 769, 772 (Miss. Ct. App. 2004) (citing ***City of Grenada v. Whitten Aviation, Inc.***, 755 So. 2d 1208, 1214 (Miss. Ct. App. 1999)).

¶11.  All contracts contain an implied covenant of good faith and fair dealing in performance and enforcement. ***Morris v. Macione***, 546 So. 2d 969, 971 (Miss. 1979).  Good faith has been defined as "the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party." ***Cenac v. Murry***, 609 So. 2d 1257, 1272 (Miss. 1992).  Bad faith has been defined by this Court as requiring "a showing of more than bad judgment or negligence; rather, 'bad faith' implies some conscious wrongdoing 'because of dishonest purpose or moral obliquity.'" ***Univ. of S. Miss. v. Williams***, 891 So. 2d 160, 170-71 (Miss. 2004) (quoting ***Bailey v. Bailey***, 724 So. 2d 335, 338 (Miss. 1998)).

¶12.  The Appellants claim that Dr. Limbert cannot have acted in "bad faith" because she exercised a clear contractual right pursuant to Section 7.2 of the affiliation agreement to terminate the agreement upon sixty days' written notice. The Association contends that Dr. Limbert exercised this termination provision in a manner that violates the "inherent covenant of good faith and fair dealing" contained therein, thus acting in bad faith.  However, the Association offers nothing in the way of evidence of bad faith other than Dr. Limbert's termination of the agreement and the decision to affiliate with another alumni entity.  The chancery court based its finding of bad faith on the fact that Dr. Limbert's termination of the

agreement was a result of Dr. Limbert's refusal to approve the bylaws that were submitted by the Association because those bylaws did not contain Dr. Limbert's desired procedures for nominating Association officers. Pursuant to Section 5.2 of the affiliation agreement,[5] Dr. Limbert reserved the right for the University Alumni Director to appoint four members of the nominating committee.

¶13. In interpreting the terms of a contract, this Court has stated the first step is to apply "the 'four corners' test," and in doing so the court looks to the plain language of the parties used to express their agreement. *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc*., 857 So. 2d 748, 752 (Miss. 2003) (citing *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 352 (Miss. 1990); *Pfisterer v. Noble*, 320 So. 2d 383, 384 (Miss. 1975)). "Our concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy." *Id.* (citing *Simmons v. Bank of Miss*., 593 So. 2d 40, 42-43 (Miss. 1992)). The Association does not argue the termination clause was invalid, or

---

[5]Affiliation Agreement Section 5.2 states:

The process for nominations for the Association Officers shall be an inclusive process designed to achieve representation that reflects the membership of the alumni. The Association's Constitution and By-Laws shall set forth a nominating process that includes, among other provisions, a seven member nominating committee with four members appointed by the University Alumni Director and three members appointed by the Association's President. This committee will present candidates for each office for approval by the Association. The Constitution and By-Laws could include a method for additional nominations from the floor at the Association's annual meeting.

that the affiliation agreement was an invalid contract, or that the contract was signed as a result of duress. To the contrary, both parties negotiated this agreement at arms' length, represented by counsel, and with full knowledge that the agreement provided for termination without cause upon sixty days' notice, as well as approval by Dr. Limbert of the nomination process in the Association's constitution and bylaws.

¶14.    Article 7, Section 7.2 of the affiliation agreement states in its entirety that "[t]his Agreement may be terminated by either party upon at least 60 days written notice."[6] In looking to the clear, unambiguous language of the termination clause, the inescapable conclusion is that Dr. Limbert was exercising her contractual right to terminate the affiliation agreement upon sixty days' notice.  This Court has held that a party has not breached the implied covenant of good faith and fair dealing when the party "took only those actions which were duly authorized by the contract." *GMAC v. Baymon*, 732 So. 2d 262, 269 (Miss. 1999).  Thus under the rule promulgated in *Baymon*, Dr. Limbert could not have acted in bad faith when she exercised a contractual right. By ordering Dr. Limbert to uphold the agreement, the chancellor essentially rewrote the agreement, excluding the termination clause.  In doing so, the learned chancellor unfortunately failed to apply the unambiguous language of the contract and, as a result, committed reversible error.

---

[6]Article 7, Section 7.4 of the affiliation agreement states in pertinent part that "[w]ithin 30 days of termination of this Agreement *for any reason*, the University may . . . ." (Emphasis added).

9

## II. WHETHER THE CONSTITUTIONAL PRINCIPLE OF SEPARATION OF POWERS REQUIRES THAT A MISSISSIPPI COURT DEFER TO AN EXECUTIVE-BRANCH AGENCY IN THE INTERPRETATION AND IMPLEMENTATION OF THAT AGENCY'S RULES AND REGULATIONS.

¶15.     This Court agrees with the Appellants' assertion that the judicial branch should not engage in policy decisions, particularly in those areas delegated by constitution and by statute to a specific agency. The Mississippi Constitution provides the three branches of government (legislative, judicial, and executive) with distinct powers and dictates no one branch "shall exercise any power properly belonging to either of the other."Miss. Const. art 1, § 1 (1890). Furthermore, it is the role of the judiciary to determine when the executive and legislative branches have overstepped their boundaries. *Albritton v. City of Winona*, 181 Miss. 75, 96, 178 So. 799, 803 (1938). However, we cannot find that either Dr. Limbert, acting with the approval of IHL, or IHL acted beyond the scope of its authority. Thus, by not affording deference to IHL's interpretation and implementation of its own policy regarding the independence of affiliated entities, the chancellor violated the doctrine of separation of powers.

¶16.     In order to maintain the balance between the distinct branches of government, this Court employs a limited inquiry into administrative-agency decisions. "In reviewing an administrative agency's findings of fact, the [trial] court and this Court afford great deference to an administrative agency's construction of its own rules and regulations and the statutes under which it operates." *Smith v. Univ. of Miss.*, 797 So. 2d 956, 960 (Miss. 2001) (citing *Board of Supervisors v. Waste Mgmt. of Miss., Inc.*, 759 So. 2d 397, 400 (Miss. 2000);

10

*McDerment v. Miss. Real Estate Comm'n*, 748 So. 2d 114, 118 (Miss. 1999)). However, an agency's interpretation of its own regulation must be overturned if "so plainly erroneous or so inconsistent with either the underlying regulation or statute as to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Tower Loan of Miss. Inc. v. Miss. Tax Comm'n*, 662 So. 2d 1077, 1081 (Miss. 1995) (citing *Bd. of Tr. of State Insts. of Higher Learning v. Sullivan*, 763 F. Supp. 178, 184 (S.D. Miss. 1991)). This Court has defined the terms "arbitrary" and "capricious" as follows:

> [A]n administrative agency's decision is arbitrary when it is *not done according to reason and judgment*, but *depending on the will alone*. An action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and *settled controlling principles*. *Miss. State Dep't of Health v. Natchez*, 743 So. 2d 973, 977 (Miss. 1999); *See also* *Burks v. Amite County Sch. Dist.*, 708 So. 2d 1366, 1370 (Miss. 1998).

*Miss. Dep't of Human Servs. v. McNeel*, 869 So. 2d 1013, 1018 (Miss. 2004) (emphasis added).

¶17.    IHL's authority to govern Mississippi's public universities is derived from both constitutional and statutory sources. *See* Miss. Const. art 8, § 213-A (1890); Miss. Code Ann. § 37-101-15(c) (Rev. 2007). IHL Policy 301.0806 pertains to universities and their affiliated entities and states in pertinent part:

> [T]he Board of Trustees has responsibility for ensuring the public interest is served by any individual or organization established to support an institution of The Mississippi State Institutions of Higher Learning. While the Board of Trustees cannot control or direct individuals or private organizations, it has the full authority to control the activities of its agents and agencies in their relationships with such individuals or organizations.

11

¶18.  The chancery court found the language of the affiliation agreement to be a usurpation of the Association's independence by Dr. Limbert and, as such, a violation of IHL policy. Despite IHL's approval of this agreement, the chancery court found IHL to be in violation of its own policy in that IHL was implementing its policy in an arbitrary manner.  Moreover, the chancellor found that Dr. Limbert's association with the New Alumni Association was evidence of bad faith, although IHL likewise approved this agreement.  By not requiring Dr. Limbert to seek its approval of this disaffiliation, and by approving Dr. Limbert's affiliation agreement with the new alumni association, IHL essentially sanctioned those decisions in keeping with its interpretation of its own polices.  IHL, as an administrative body, and Dr. Limbert, acting as its agent, should have been afforded "great deference" by the chancellor in the "construction of its own rules and regulations and the statutes under which it operates."

¶19.  IHL policy 301.0806 states that the independence of affiliated entities is ensured in that ". . . . no employee of the Mississippi State Institutions of Higher Learning shall hold a voting position on an institutionally affiliated entity board . . . . senior administrators of the institution should only participate on the affiliated entity's board in an ex-officio capacity." As to IHL's interpretation of this policy, Dr. Meredith testified that IHL's definition of "independent" was that it was left up to the university president to define. However, the chancery court expressly rejected the IHL Board's construction of the term "independent" by defining "independent entity" in light of *City of Picayune v. S. Reg'l Corp.*, 916 So. 2d 510, 523 (Miss. 2005), as one possessing "free will to the extent provided by its own articles of incorporation, bylaws and the laws of the state in which it is incorporated."

12

¶20.    The Association argues that the chancery court reached the correct result for the wrong reasons in that the chancellor simply should have applied the plain meaning of the word "independent" rather than looking to case law for a definition. In the Association's argument for applying the plain meaning of "independent," it cites the Merriam-Webster definition  as:  "not subject to control by others," "self-governing," "not affiliated with a larger controlling unit," and "not looking to others for one's opinions or for guidance in conduct."[7] The Association claims that in the absence of ambiguity, the courts have full authority to reject an agency's improper interpretation or application of its own policy and impose a plain-meaning application of the term. In defining "independent," however, the Association neglects to ascertain the plain meaning of "affiliate": "to bring or receive into close connection as a member or branch," "to connect or associate oneself," "combine."[8] It is clear that it was IHL's intent to require universities and their various affiliations to enter into formal agreements in an effort to inspire public confidence in these affiliated entities. Public confidence is crucial where entities hold themselves out as part of the university community and receive substantial amounts of money on behalf of these universities. This Court finds that IHL's purpose in instilling public confidence by requiring affiliation agreements would be thwarted if IHL was prevented from giving university presidents discretion as to which entities were deserving of the university's close association.

_____

[7]citing www.m-w.com (last visited April 1, 2008) (Merriam-Webster website).

[8]http://www.merriam-webster.com/dictionary/affiliate (last visited September 16, 2008).

13

¶21. Given the history between members of the Association and university administrators, Dr. Limbert's rejection of the Association's amended constitution and bylaws based on her apprehension at continuing to affiliate with an entity whose leadership she perceived as undermining the mission and objectives of MUW will assuredly be debated among fair-minded individuals possessing reason and judgment. That which is "'[f]airly debatable' is the antithesis of arbitrary and capricious." *Town of Florence v. Sea Lands, Ltd.*, 759 So. 2d 1221, 1223 (Miss. 2000) (quoting *Saunders v. City of Jackson*, 511 So. 2d 902, 906 (Miss. 1987)). IHL, with full knowledge of its own polices requiring independence of affiliated entities, approved the affiliation agreement entered into by Dr. Limbert and the Association requiring the Association to amend its constitution and bylaws subject to approval by Dr. Limbert and allowing Dr. Limbert to retain power to appoint members to the Association's nominating committee.

¶22. Moreover, nothing in IHL policy required approval of disaffiliation, but instead only approval of affiliation agreements. No policy limited the number of alumni associations with which MUW could affiliate. To this end, we are constrained to find that the chancellor abused her discretion in ordering the dissolution of the IHL-sanctioned New Alumni Association Agreement.

¶23. Unable to find that either IHL or Dr. Limbert, as an agent of IHL, superseded their authority, this Court holds that the administrative decisions at issue in this case are not subject to a trial court substituting its judgment and discretion for that of Dr. Limbert and IHL regarding entities or groups which are best suited to affiliate with MUW. In doing so,

14

the chancellor erroneously disturbed the balance of the separation of powers. Finding these administrative decisions neither arbitrary nor capricious, and failing to find an abuse of discretion or action otherwise contrary to well-established law, we are constrained as a matter of law to reverse the chancellor on this issue as well.

¶24.    Having resolved the relevant issues in favor of the Appellants, this Court further finds that MUW and IHL are entitled to retain an exclusive property interest in their names and symbols. The affiliation agreement expressly required acknowledgment by the Association that MUW was permitting the Association to use these names and symbols pursuant to the terms of the affiliation agreement. With the affiliation agreement now dissolved, so too are the Association's privileges to use MUW's names and symbols.

¶25.    Based on the disposition of the two issues discussed herein, the remaining issues need not be addressed.

**CONCLUSION**

¶26.    In sum, we find that the chancellor erroneously found the affiliation agreement between MUW and the Association was terminated by Dr. Limbert in bad faith. To substitute the judgment of the trial court for IHL's interpretation and implementation of its own policies was an abuse of discretion. Due to the dissolution of the affiliation agreement, MUW is entitled to injunctive relief as to the exclusive use of its names, symbols, marks, logos, and insignia. Thus, for the reasons stated, the Lowndes County Chancery Court's judgment entered in favor of the Mississippi University for Women Alumnae Association is reversed, and judgment is rendered here in favor of Claudia Limbert, individually and in her official

15

capacity as President of Mississippi University for Women; the Mississippi University for Women; and the Board of Trustees of Mississippi State Institutions of Higher Learning.

¶27.	**REVERSED AND RENDERED**.

**WALLER, P.J., DICKINSON AND RANDOLPH, JJ., CONCUR.  DIAZ, P.J., AND GRAVES, J., DISSENT WITHOUT SEPARATE WRITTEN OPINION. SMITH, C.J., EASLEY AND LAMAR, JJ., NOT PARTICIPATING.**