ROBERTS, J.,
for the Court:
¶ 1. Gulfport Shopping Center Inc. (GSC) and five of its six shareholders— namely John M. Hill, Michael V. Shannon, David L. Stroebel, C. Hadley Weaver, and Dewayne Williams (the accused shareholders) — appeal the Harrison County Chancery Court’s decision to award GSC’s sixth shareholder, William H. Durham, a judgment of $263,988.89. Durham sued GSC and the accused shareholders after Durham had agreed to assume GSC’s financial liabilities during a failed attempt to acquire all of GSC’s stock incident to an option agreement. The chancellor found that GSC and the accused shareholders acted in bad faith when they neglected to inform Durham that GSC had received income during the term of Durham’s option. The chancellor found no merit to GSC’s counterclaim for $110,000 in rental income received during Durham’s option. Aggrieved, GSC and the accused shareholders appeal. After careful consideration, we find that the cháncellor committed reversible error when he awarded a judgment to Durham in the amount of the bankruptcy proceeds. However, we affirm the chancellor’s decision to deny GSC’s counterclaim for $110,000 in rental income received during Durham’s option. Accordingly, we affirm in part and reverse and render in part.
FACTS AND PROCEDURAL HISTORY
¶ 2. This litigation is the result of an unsuccessful attempt to establish a 6.2 *353 acre, single-building commercial shopping center along Highway 49 in Gulfport, Mississippi. In 1994, Durham paid Williams $700,000 for an interest in approximately twenty-two acres of commercial property adjacent to GSC’s building and 2,450 shares of GSC — representing one-half of Williams’s stock in GSC and 24.5% of GSC’s total stock.[1]
¶ 3. GSC maintained two mortgages on its building. Guardian Life Insurance Company of America (GLICA) held the first mortgage of approximately $2,200,000. As conditions of that mortgage, GLICA required that GSC’s shareholders act as personal guarantors of GSC’s mortgage. The City of Gulfport held GSC’s second mortgage, which was approximately one million dollars.[2] As security against GSC’s second mortgage, GLICA required that GSC place $5,700 into an escrow account each month. Laureate Capital managed the escrow account.
¶ 4. GSC’s tenant, Bruno’s Inc., operated a Food World grocery store. GSC managed to pay its debts with the income from the Bruno’s lease. However, Bruno’s declared bankruptcy in 1998. When Bruno’s stopped paying on its lease, GSC could not pay its debts. GSC faced the possibility of foreclosure.
¶ 5. Durham requested an option to purchase all of GSC’s stock. In May 1998, Durham and the accused shareholders entered into an option agreement. The option agreement provided as follows:
1. Term of the [ojption to be 60 days.
2. Dr. Durham [will] bring all payments to [GLICA] current together with all late charges and attorney[’s] fees, in the amount of $58,534.50, and [will] keep the monthly payments current during the 60 day option period.
3. Dr. Durham will reach an agreement with [GLICA] to permit him to take over the corporation without creating an event of default. If permitted to take over the corporation, then Dr. Durham will deliver to [the other shareholders] letters of credit, totalling [sic] $200,000.00 for a term of 1 year, to protect them in the event of a default under the loan in which [GLICA] makes demand for payment under their [l]imited [g]uaranty in the amount of $300,000.00 or have [GLICA] accept Dr. Durham’s- [l]imited [g]uaranty and release the [guaranties of [the accused shareholders].
4. In the event Number 3 does not occur, Dr. Durham will pay off the loan with [GLICA],
5. Dr. Durham will pay off [the][n]ote in favor of Hancock Bank, in the principal amount of $25,000.00, ... the proceeds of which were used to pay [the] past year’s property taxes.
Dr. Durham may exercise his [o]ption to [p]urchase at any time within 60 days from [the] date by fulfilling the above conditions^] and all outstanding stock will be transferred to him at that time[;] Dr. Durham will then own 100% of [GSC’s] stock.
The accused shareholders delivered their stock certificates to Attorney Donnie Riley, who held them in escrow during Durham’s option.
¶ 6. Although Durham’s option had a stated term of sixty days, the parties ac *354 quiesced to extend it for approximately two years. During that time, Durham fulfilled his obligation to bring the GLICA mortgage current. Through March 2000, Durham paid approximately $648,000 toward that debt. Durham also paid for taxes, insurance, and maintenance on GSC’s building. Additionally, Durham paid off the $25,000 loan from Hancock Bank.
¶ 7. Meanwhile, Durham strived to find another tenant for GSC’s building. He temporarily leased some space to State Farm, which paid $110,000 in rental income.[3] However, Durham’s primary focus was securing a lease with the Mississippi Space Commerce Initiative (MSCI). In March 1999, Durham sent a proposed lease agreement to MSCI. Durham v. Univ. of Miss., 966 So.2d 832, 834 (¶4) (Miss.Ct.App.2007). Durham later explained that he had an agreement with Larry Wygel and an entity identified as the Hammes Company. According to Durham, if MSCI had leased GSC’s building, the Hammes Company would have then paid Durham $9,000,000 for thirty-one adjacent acres of property that Durham personally owned. However, Durham’s attempt to secure a lease with MSCI was unsuccessful. Id. at (f 5). In March 2000, MSCI told Durham that it was “no longer interested in pursuing [the lease].” Id.
¶ 8. It appears that Durham became disheartened after MSCI declined to lease GSC’s building. In anticipation that MSCI would lease GSC’s building and then pay GSC’s ad valorem taxes, Durham did not pay GSC’s ad valorem taxes when they became due. Durham stopped making the GLICA payments after March 2000. Durham also allowed the requisite letters of credit to lapse. Additionally, Durham stopped funding the escrow account that GLICA required. On December 10, 1999, Laureate Capital wrote to Shannon to inform him that GSC’s mortgage with GLI-CA was in default for reasons that were not related to GSC’s failure to pay. On January 21, 2000, the attorney for the City of Gulfport informed GSC that an interest payment of approximately $33,600 had been due on July 30, 1999. Laureate Capital would not release the proceeds of the escrow account to Gulfport. Although the Laureate Capital escrow account contained roughly $350,000, GLICA took the position that the escrow account was part of its own collateral, so GLICA would not release any of the proceeds of the escrow account to the City of Gulfport. GLICA also refused to allow Durham to assume GSC’s mortgage debt without paying a one-percent transfer fee, which Durham never paid. On April 19, 2000, GSC’s lawyer contacted Riley and instructed him to return the accused shareholders’ stock certificates because they had formally terminated Durham’s option.
¶ 9. Meanwhile, Bruno’s bankruptcy proceeding had progressed. The record contains a release dated May 12, 2000, by which Hill agreed to accept $263,988.89-representing 30% of the money that Bruno’s owed GSC under its lease. On May 25, 2000, GSC received a check from Bruno’s bankruptcy proceedings, but the check referenced “Flynt’s Crossing Shopping Center.” Consequently, GSC returned that check.
¶ 10. Durham later approached the accused shareholders with a proposal regarding another potential lessee, IMIX, Inc. Durham requested another option to purchase all of the accused shareholders’ *355 stock in GSC. On June 8, 2000, the accused shareholders gave Durham a second option, which contained the following terms:
If at the end of [the] 15-day time period, ... Durham satisfactorily performs all of [the] conditions, he will have the right to purchase all of [GSC’s] stock of the corporation for:
(1) If no money is recovered from Bruno’s bankruptcy, then for all sums paid by [GSC] from now and after June 8, 2000[,] in order to reinstate mortgage payments, taxes[,] and other corporate expenditures; but
(2) In the event funds are received from [Bruno’s] bankruptcy, then notwithstanding (1) above, the purchase price of the stock of all of the shares will be the gross amount of [the] funds (with 24.5% of [the] gross amount to remain in the corporation representing the 24.5% of all stock issued and outstanding which ... Durham now owns).
At some point during the telephonic board meeting, Durham became angry. He left the board meeting before it concluded. Thus, he was not present when the accused shareholders discussed the impending payment from Bruno’s bankruptcy proceedings. However, Durham’s attorney, Tom Starling, remained at the meeting.
¶ 11. On June 12, 2000, GSC received the corrected check from the Bruno’s bankruptcy proceedings. GSC had the proceeds placed in an escrow account. According to Durham, the other shareholders did not tell him that they had received the check. From the Bruno’s bankruptcy proceeds, GSC paid GLICA approximately $151,000. GSC also paid the Harrison County Tax Collector $68,000. Additionally, GSC paid its property-insurance agent and its lawyers. As of the time of trial, the escrow account contained approximately $21,000.
¶ 12. Durham did not fulfill the terms of his June 2000 option. In August 2000, Durham refused the accused shareholders’ invitation to make another offer to buy the remainder of GSC’s stock. To prevent foreclosure by the City of Gulfport, the accused shareholders gave Williams an option to purchase their stock in GSC. Despite Williams personally paying approximately $436,000 toward GSC’s debts and other expenses, GSC ultimately lost its property to foreclosure.
¶ 13. On April 10, 2001, Durham sued GSC and the accused shareholders.[4] He sought “an accounting of [GSC’s] financial affairs and all [of its] corporate accounts.” He also requested an accounting of the escrow account in which GSC deposited the Bruno’s bankruptcy proceeds. Durham also sought to set aside Williams’s acquisition of GSC’s property. Additionally, Durham requested that the chancellor set aside GSC’s use of the Bruno’s bankruptcy proceeds for any purpose other than paying the GLICA mortgage. Durham also claimed he was entitled to reimbursement of the money he spent during the term of his option.[5] GSC and the accused shareholders filed a counterclaim against Durham and sought the $110,000 that State Farm paid GSC while it rented a portion of GSC’s building. The chancellor dismissed most of Durham’s claims after GSC and the accused shareholders successfully moved for partial summary judgment. Nevertheless, Durham’s claims *356 for reimbursement and an accounting remained viable.
¶ 14. On November 12, 2009, the parties went to trial on Durham’s remaining claims. On April 8, 2010, the chancellor entered his judgment. The chancellor held that GSC had received the Bruno’s bankruptcy proceeds on May 25, 2000. The chancellor also held that the accused shareholders failed to inform Durham that GSC had received money from Bruno’s bankruptcy proceedings. As for the money that Durham spent during the term of his option, the chancellor found that Durham “cannot ... complain that his bargain to pay corporate expenses was not what he intended to do [during the option].” Consequently, the chancellor found that Durham was not entitled to recover the money he spent during his option.
¶ 15. However, the chancellor was “perplex[ed]” by “the timing of the Bruno’s bankruptcy funds.” According to the chancellor, Durham “was not made aware of the imminent payment of the funds when he was notified on May 19, 2000[J” that his option had been terminated. The chancellor went on to find that the accused shareholders “knew the funds had been received and ... couched the June 8, 2000 minutes with language that presupposed the funds were not on hand or may not even materialize.” The chancellor then concluded that GSC “realized” the Bruno’s bankruptcy proceeds during Durham’s option. The chancellor declined to find that the Bruno’s bankruptcy proceeds would have changed the outcome of Durham’s attempt to acquire all of GSC’s stock. Even so, the chancellor concluded that “good faith and fair dealing as is implied in every contract should have given [Durham] the knowledge of and benefit and use of those funds in his efforts during the time when he had assumed the corporate obligations.” Accordingly, the chancellor awarded Durham a judgment of $263,988.89. Additionally, the chancellor held that GSC and the accused shareholders were jointly and severally liable for that amount. The chancellor found no merit to GSC and the accused shareholders’ counterclaim. Following an unsuccessful motion to alter or amend the judgment, GSC and the accused shareholders appeal.
STANDARD OF REVIEW
¶ 16. “This Court will not disturb the chancellor’s findings when they are supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous[,] or an erroneous legal standard was applied.” In re Estate of Byrd, 749 So.2d 1214, 1218 (¶ 14) (Miss.Ct.App.1999) (citation omitted). “We consider the entire record before us and accept all those facts and reasonable inferences therefrom which support the chancellor’s findings.” Id. (citing Madden v. Rhodes, 626 So.2d 608, 616 (Miss.1993)). “The chancellor sits as fact-finder and his conclusions regarding witness credibility and what weight and worth to assign to the testimony of the various witnesses are entitled to substantial deference.” R.B.S. v. T.M.S., 765 So.2d 616, 619 (¶ 9) (Miss.Ct.App.2000) (citation omitted). “Only if, for reasons that we find persuasive, we are convinced that the chancellor was manifestly wrong or clearly erroneous in his findings may we intercede.” Id. (citing Murphy v. Murphy, 631 So.2d 812, 815 (Miss.1994)).
ANALYSIS
¶ 17. The chancellor held that the accused shareholders were liable to Durham because they breached their implied contractual duty of good faith and fair dealing. Stated differently, the chancellor held that the accused shareholders acted in bad faith *357 when they concealed GSC’s receipt of the Bruno’s bankruptcy proceeds — which were realized during Durham’s option.
¶ 18. “All contracts contain an implied covenant of good faith and fair dealing in performance and enforcement.” Limbert v. Miss. Univ. for Women Alumnae Ass’n, 998 So.2d 993, 998 (¶ 11) (Miss.2008) (citing Morris v. Macione, 546 So.2d 969, 971 (Miss.1989)). “Bad faith has been defined ... as requiring a showing of more than bad judgment or negligence; rather, bad faith implies some conscious wrongdoing because of dishonest purpose or moral obliquity.” Id. (citations and internal quotations omitted).
¶ 19. There is no issue regarding whether the accused shareholders had the right to terminate Durham’s option. The chancellor did not find that the accused shareholders improperly terminated Durham’s option, and Durham did not cross-appeal the chancellor’s conclusion. The only issue on appeal is whether the accused shareholders acted in bad faith by concealing GSC’s receipt of the Bruno’s bankruptcy proceeds during Durham’s option.
¶ 20. First and foremost, the chancellor was manifestly incorrect when he found that GSC “realized” the Bruno’s bankruptcy proceeds during Durham’s option. The chancellor’s error may have been predicated on his incorrect finding that Durham’s May 1998 option had been terminated on May 19, 2000. During direct examination of Durham, Durham’s attorney referred to the date of termination as May 19, 2000. But Durham repeatedly and unequivocally testified that the accused shareholders terminated his option on April 19, 2000. Furthermore, the termination letter to Riley was dated April 19, 2000.
¶ 21. Acting on GSC’s behalf, Hill signed a release for the Bruno’s bankruptcy proceeds on May 12, 2000. And although GSC had received a check from the Bruno’s bankruptcy proceedings on May 25, 2000, GSC could not deposit that check because it had incorrectly been assigned to “Flynt’s Crossing Shopping Center.” GSC returned that check. In that sense, the chancellor was manifestly incorrect when he held that GSC received its portion of the Bruno’s bankruptcy proceeds on May 25, 2000.
¶ 22. The chancellor was also manifestly incorrect when he held that the accused shareholders had “couched” the minutes of the June 8, 2000 meeting “with language that presupposed [that] the [Bruno’s bankruptcy] funds were not on hand or may not even materialize.” The June 8, 2000 minutes contain a memorialization of the second option granted to Durham. That option contained two means by which Durham could acquire the accused shareholders stock in GSC. Those two means were contingent on whether GSC received money from Bruno’s bankruptcy proceedings. And one of those contingencies was based on the event that “no money is recovered from Bruno’s bankruptcy.” However, viewed in conjunction with a concurrent “resolution to authorize the chairman of the corporation to use corporate funds to bring mortgage loans current,” which was attached to the minutes as an exhibit, it is clear that the minutes were not couched to be misleading. The resolution stated that GSC “anticipate^] receiving a settlement from the bankruptcy court on behalf of Bruno’s in the amount of $263,988.89.” The only uncertainty was when GSC would receive those funds.
¶23. Moreover, Durham was at the June 8, 2000 meeting. • Although Durham became angry and left the meeting before it concluded, Durham’s attorney remained at the meeting for the duration. In other words, Durham’s agent attended the entire *358 meeting. If Durham was uninformed that GSC anticipated receiving a check from Bruno’s bankruptcy proceedings, it was due to a lack of communication between Durham and his attorney, rather than the accused shareholders’ concerted effort to mislead Durham.
¶ 24. It is undisputed that GSC received a correctly drafted check from Bruno’s bankruptcy proceedings on June 12, 2000. The evidence indicated that all of the Bruno’s bankruptcy proceeds were used for proper corporate purposes. Durham takes issue with the fact that a portion of the Bruno’s bankruptcy proceeds went to attorneys to represent GSC and the other shareholders in this lawsuit. However, Durham had sued GSC as well as the accused shareholders. GSC is entitled to hire counsel when it is sued. There was no evidence that it was a conflict of interest for the same attorneys to represent GSC and the accused shareholders.
¶ 25. Durham took a risk when he agreed to assume GSC’s debts during the term of his option. According to Hill, Durham said he would “roll the dice” and attempt to secure a new tenant for GSC’s building. He agreed to pay GSC’s corporate expenses during his option because he had his own motivation to acquire a new tenant for GSC. Durham answered “yes” when asked whether securing a new tenant “would significantly increase the value of [his] property in the area.” Durham testified that he and Larry Wygel of the Ham-mes Company had an “arrangement” in that “once the [MSCI] lease was signed[,] and [MSCI] occupied [GSC’s] building, [the Hammes Company] would ... recruit synergistic companies for the building[;] and [it] would also purchase the adjacent thirty acres of mine to [GSC’s] building for nine million dollars.” In other words, Durham expected to sell his own property for $9,000,000 if he could finalize MSCI’s lease of GSC’s building.
¶ 26. As stated above, “[b]ad faith has been defined ... as requiring a showing of more than bad judgment or negligence; rather, bad faith implies some conscious wrongdoing because of dishonest purpose or moral obliquity.” Limbert, 998 So.2d at 998 (¶ 11) (citations and internal quotations omitted). There was no evidence that GSC or the accused shareholders acted in any way that implied “conscious wrongdoing because of dishonest purpose or moral obliquity.” We find that the chancellor committed reversible error when he concluded that GSC and the accused shareholders acted in bad faith. Consequently, we reverse that portion of the chancellor’s judgment and render judgment for GSC and the accused shareholders.
¶ 27. As for GSC and the accused shareholders’ counterclaim for $110,000, we do not find that the chancellor committed manifest error when he declined to award a judgment against Durham for that figure. The chancellor held that the State Farm rental income was “received by [Durham] during the option period when he had full fiscal responsibility of the corporate activities and [the rental income was] received in consequence of his performance under the option which precludes any claim thereto by the other shareholders.” Durham spent far more of his own funds than State Farm paid in rent. The option agreement was silent as to whether Durham had the right to use corporate income for corporate expenses. There was no evidence that Durham misappropriated the rental income. There was sufficient evidence for the chancellor to conclude that the State Farm rental income was essentially a setoff of the money that Durham spent during his option. Accordingly, we affirm that portion of the chancellor’s judgment.
*359 ¶ 28. THE JUDGMENT OF THE HARRISON COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND RENDERED IN PART. ALL COSTS OF THIS APPEAL ARE SPLIT EQUALLY BETWEEN THE PARTIES.
LEE, C.J., IRVING AND GRIFFIS, P JJ., BARNES, ISHEE AND MAXWELL, JJ., CONCUR. CARLTON AND FAIR, JJ., CONCUR IN RESULT ONLY. RUSSELL, J., CONCURS IN PART AND IN THE RESULT.

. It is unclear how Durham's $700,000 was allocated between the GSC stock and the interest in Williams's property.

. Under an escrow agreement between GSC, GLICA, and the City of Gulfport, GSC did not have to start making payments on its second mortgage until October 1998.

. State Farm operated a temporary claims center out of GSC’s building for approximately one year. Durham later testified that he kept GSC’s income from the State Farm lease.

. Durham sued MSCI on November 27, 2001. Durham, 966 So.2d at 834 (¶ 6).

. In his suit against MSCI, Durham also claimed that MSCI was liable for the money he spent toward GSC’s debt while he attempted to secure MSCI as a tenant of GSC’s building.